**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

DAHLIA BERMAN                                    )
      *Plaintiff,*                              )
                        )
v.                                              )      Case No: 24-10939
                        )
ENGLEWOOD HOSPITAL,                              )
      *Defendant.*                             )
_____)

## COMPLAINT

   **COMES NOW** the PLAINITFF, Dahlia Berman, by and through her counsel, hereby files

this Complaint.

## INTRODUCTION AND STATEMENT OF THE CASE

    1.    Plaintiff Dahlia Berman was a sonographer at Englewood Hospital for four

years, from July 2018 to July 27, 2022.  During that time, she received promotions and

commendations for her professionalism. She was never disciplined.  She had a reputation

for her professional manner and for establishing good rapport with her coworkers and her

patients.

    2.    She is an Orthodox Jewish woman. She was summarily fired based on

religious discrimination on July 27, 2023

    3.    The pretext for firing Ms. Berman was based on a false report to Human

Resources (HR) made by a Muslim coworker who told HR that she overheard Ms. Berman

made an anti-Muslim statement to another employee. When confronted by HR, Ms.

Berman denied the false accusation. HR could have easily verified that the allegation

against Ms. Berman was false but instead of conducting a thorough investigation to

determine the truth, HR and Englewood Hospital decided to terminate Ms. Berman based

on a single frivolous demonstrably false accusation.

4.      The decision to terminate Ms. Berman was made without any investigation into the matter, and in the process of terminating Ms. Berman, Englewood Hospital violated several of its normal written procedures and policies, and additionally violated federal COBRA laws.

5.      This lawsuit alleges that the reason that Englewood Hospital took swift action against Ms. Berman without doing a proper investigation and in violation of several of its own policies was because Englewood Hospital, confronted with a conflict that involved a Muslim employee making an accusation against a Jewish employee, made religion the primary motivating factor in its decision to terminate Ms. Berman, instead of conducting a true fact finding investigation to determine the truth.

6.      Additionally, Englewood Hospital retaliated against Ms. Berman for following Englewood Hospital procedures to appeal her termination by violating COBRA laws.

7.      Ms. Berman suffered substantial damages as a result of the unlawful termination and retaliation and seeks compensation.

<u>**JURISDICTION AND VENUE**</u>

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1343(3), and 42 U.S.C. § 1983, which confer original jurisdiction on federal district courts in suits to redress the deprivation of rights, privileges and immunities secured by the laws and Constitution of the United States.  This Court has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367(a).

2.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the acts and transactions complained of occurred, and continue to occur in this District.

## PARTIES

3.      Ms. Berman is an adult citizen of the State of New Jersey.

4.      Defendant ENGLEWOOD HOSPITAL (the "Hospital") is a corporation authorized to do business in the state of New Jersey and having its principal place of business there.

## FACTS

### The Underlying incident on July 18, 2022, that led to Plaintiff's termination

5.      Ms. Berman worked as a medical sonographer at the Hospital from July 2018 to July 27, 2022.

6.      While Ms. Berman was employed at the Hospital, she received multiple promotions and commendations.

7.      She had a reputation with coworkers and patients of being always very respectful and professional.

8.      Ms. Berman is Jewish and practices her religion in the Orthodox Jewish tradition.

9.      Ms. Berman dresses in a manner consistent with the tenants of her religion; pursuant to her religious beliefs, she does not wear pants and does not allow her arms or her hair to be exposed.  Accordingly, for religious reasons, instead of the standard hospital scrubs worn by other female health care providers, she wears a scrub skirt; she wears long sleeves under her scrubs so as not to allow her arms to be exposed; and she covers her hair with a head scarf for religious reasons.

Page 3 of 26

10. Because of her unusual dress, it is known to her coworkers at the Hospital that Ms. Berman is an Orthodox Jewish woman.

11. On or about July 27, 2022, Ms. Berman was unilaterally terminated from the Hospital based on a series of events that stemmed from an incident that took place on July 18, 2022.

12. On or about July 18, 2022, Ms. Berman was treating patients in the usual manner at the Hospital.

13. She noticed that her next patient was a woman dressed in traditional Muslim attire that covered the women's entire body with only her eyes exposed. This woman was accompted by her husband who was also dressed in traditional Muslim attire.

14. Ms. Berman lives in a close-knit Orthodox Jewish community and does not often encounter people of the Orthodox Islamic faith dressed in traditional Muslim attire.

15. In the time prior to July 18, 2022, Ms. Berman had been made aware by major Jewish organizations such as the Anti-Defamation League, and others, that antisemitism in America in general, and in New Jersey specifically, has reached record heights, due partly to tensions in the Middle East between Israel and Palestinians.[1]

16. According to the Anti-Defamation League, "Jews are regularly targeted because of their actual or perceived support for Israel and Zionism."[2]

17. Ms. Berman was aware that Jewish people like Ms. Berman who dress in

---

[1] *See, e.g.,* Antisemitism reached record levels in NJ in 2021: ADL report, NorthJersey.com, Apr. 26, 2022 https://www.northjersey.com/story/news/2022/04/26/antisemitism-nj-adl-report-record-high/7451185001/ (last visited Feb. 2, 2023).

[2] Six Facts About Threats to The Jewish Community, ADL.org, Jan. 17, 2022, https://www.adl.org/resources/blog/six-facts-about-threats-jewish-community (last visited Feb. 2, 2023).

such a way that identifies them as Orthodox Jews, are perceived as being supportive of Israel and Zionism.

18.    Ms. Berman had read news stories in major Jewish media and mainstream media about Orthodox Jewish people who were physically assaulted based on their appearance as Orthodox Jews.

19.    According to the FBI's recent hate crime statistics, American Jews make up no more than 2% of the United States population yet are targets for nearly 60% of all hate crimes.[3]

20.    An astounding 88% of American Jews are concerned about Jew-hatred in the United States.[4]  At the time of the incident, the New York Times reported there was "palpable anxiety" among Orthodox Jews in the New York metropolitan area who feared antisemitic attacks, and that based on studies by the Anti-Defamation League and police, those fears "are not unfounded."[5]

21.    Prior to the incident, the New York Times reported on specific instances of attacks on Jews by pro-Palestinian groups, noting that "The outbreak has been especially striking in the New York region, which is home to the world's largest Jewish population outside of Israel."[6]

22.    Around the time of the incident, the FBI issued warnings to Jewish

---

[3] AJC Deeply Troubled by FBI Hate Crimes Data Showing Overall Increase, Jews Most-Targeted Religious Group, American Jewish Committee, Aug. 31, 2021, https://www.ajc.org/news/ajc-deeply-troubled-by-fbi-hate-crimes-data-showing-overall-increase-jews-most-targeted (last visited Feb. 3, 2023).
[4] Id.
[5] U.S. Faces Outbreak of Anti-Semitic Threats and Violence, New York Times, May 26, 2021, https://www.nytimes.com/2021/05/26/us/anti-semitism-attacks-violence.html (last visited Feb. 3, 2023).
[6] Id.

communities in New Jersey regarding "credible information" of threats to synagogues.[7]

23.     All of this was in the backdrop of the events that occurred on July 18, 2022.

24.     Sonogram exams, like the one that Ms. Berman was about to perform on the patient dressed in Muslim attire, require the health care provider and the patient to be alone together in a dark enclosed private exam room.

25.     Because of the requirements of the exam, it is imperative for the health care provider and the patient to establish trust and a tension-free rapport with one another.

26.     Ms. Berman has a reputation for establishing trust and a good rapport with her patients.

27.     She was promoted by the Hospital multiple times in the past because of her ability to establish trust and a comfortable rapport with her patients.

28.     Prior to that day, Ms. Berman had never performed a sonogram exam on a woman dressed in full Orthodox Muslim attire as the next patient was.

29.     Because Ms. Berman is an identifiable Orthodox Jewish woman who is perceived to support Israel and Zionism, and because she had heard from Jewish organizations like the Anti-Defamation League that there are Muslims who hold animosity towards Jewish people because of their perceived support of Israel and Zionism, and because Ms. Berman had read about specific instances of Muslim-on-Jewish attacks, and because the FBI and the mainstream media had put her on hyper alert due to "credible information" about threats of physical violence against Jews, Ms. Berman justifiably felt

---

[7] The FBI warns of a 'broad' threat to synagogues in New Jersey, NPR, Nov. 3, 2022, https://www.npr.org/2022/11/03/1134195978/new-jersey-synagogues-threat-fbi (last visited Feb. 3, 2023).

nervous and even fear when without warning she was suddenly presented with a situation where she would have a very close and personal encounter with a husband and wife dressed in full Orthodox Muslim attire, which she had never in her professional life encountered.

30.     Ms. Berman maintained her composure and did not say or do anything in the presence of the patient or her husband that would reveal her concerns.

31.     Ms. Berman responsibly sought professional guidance on how to appropriately handle the situation.

32.     Due to feelings of uncertainty about how to handle this new situation, Ms. Berman decided to consult with her supervising Doctor Tamar Goldwaser about her feelings before seeing the patient.

33.     Ms. Berman felt uncomfortable sharing her concerns with her supervisor because she did not want to be falsely perceived as being racist or Islamophobic, which she is not.

34.     Ms. Berman is held to the Code of Ethics for Medical Sonographers, and since she is bound to that ethical code, she followed all the correct procedures in addressing her concerns.

35.     Under the Code of Ethics for Medical Sonographers, Ms. Berman is required to "Be truthful and promote appropriate communications with patients and colleagues," and "collaborate with professional colleagues to create an environment that promotes communications and respect."[8]

36.     Accordingly, Ms. Berman felt that before seeing the patient she was

---

[8] Code of Ethics for the Profession, sdms.org, https://www.sdms.org/about/who-we-are/code-of-ethics (last visited Feb 2, 2023).

obligated to truthfully communicate her feelings with her supervisor, regardless of how uncomfortable or difficult it was for her.

37.    Ms. Berman and Dr. Goldwaser met in an area that she and Doctor Goldwaser assumed was a private area to discuss Ms. Berman's concerns about taking her next patient.

38.    Unbeknownst to Ms. Berman at the time, another coworker, Shabonnie Longmore, was present in the area and overheard the confidential conversation.

39.    Ms. Berman began explaining her concerns to Dr. Goldwaser, while Ms. Longmore stood by and eavesdropped on the private conversation between Ms. Berman and her supervisor.

40.    Shortly after Ms. Berman started to explain her concerns to Dr. Goldwaser she noticed Ms. Longmore standing in earshot of the private conversation. Ms. Berman continued to express her uneasy feelings about her next patient to Dr. Goldwaser believing Ms. Longmore would not interfere with the private conversation.

41.    Ms. Longmore acted friendly towards Ms. Berman.

42.    Ms. Longmore did not act offended by Ms. Berman's concerns.  On the contrary, Ms. Longmore offered unsolicited advice to Ms. Berman.

43.    Ms. Longmore told Ms. Berman that the husband of the patient would ignore Ms. Berman because in Muslim culture that is typically how men interact with women. Ms. Longmore advised Ms. Berman not to address the husband directly and to only address the wife, and everything would be fine if Ms. Berman followed Ms. Longmore's advice.

44.     Ms. Berman found Ms. Longmore's statements to be incredibly offensive to Muslim men and women, especially as an Orthodox Jewish woman who is regularly subjected to the same offensive stereotypes, namely that men are misogynistic and that women must act especially differential towards men.

45.     Notwithstanding Ms. Longmore's unsolicited comments, Ms. Berman found that simply confiding her feelings with Dr. Goldwaser provided Ms. Berman with the opportunity to process her initial feelings of uncertainty and fear. This enabled her to gain perspective and be comfortable treating the patient.

46.     Ms. Berman treated the patient, and the appointment went smoothly.

47.     The patient and her husband were completely unaware of Ms. Berman's concerns. Ms. Berman as always treated her patient with respect and in a professional manner, and the patient left satisfied with Ms. Berman's treatment with no complaints.

48.     A few hours later, on July 18, 2022, Ms. Berman went on her lunch break.

49.     While on her lunch break, Ms. Longmore called Ms. Berman's personal cellphone and verbally assaulted and harassed her.

50.     On this phone call, Ms. Longmore screamed and yelled at Ms. Berman.

51.     Ms. Longmore accused Ms. Berman of being racist and of discriminating based on religion.

52.     Ms. Longmore revealed to Ms. Berman for the first time that she identifies as Muslim and that she personally knew the patient and her husband.

53.     Ms. Berman did not know until that moment that Ms. Longmore identified as Muslim or that she personally knew the patient or her husband.

54.    Ms. Berman had never been verbally assaulted like that before in her life.

55.    After the call, Ms. Berman started hysterically crying and was overwhelmed and did not think she could get through the rest of her workday.

56.    This phone call was so disturbing to Ms. Berman that she called her supervisor to request extra time before coming back from her lunch break because she was so shaken up by this assaultive phone call from Ms. Longmore.

57.    The supervisor was accommodating but asked if Ms. Berman would be able to return for a scheduled 2 p.m. appointment.

58.    Ms. Berman said she would, and she spent the next hour calming herself down so that she could treat her next patient and finish the workday.

59.    Around 2 p.m., on July 18, 2022, Ms. Berman returned to work to treat the next patient and to finish her shift.

60.    No one spoke to her about or addressed the incidents that had occurred earlier that day.

61.    Ms. Berman did not mention the distressing phone call to anyone except for when she asked her supervisor for extra time for her lunch break.

62.    The next day, on July 19, Ms. Berman texted Ms. Longmore to attempt to ease the tension.  Though Ms. Berman did not think she had done anything wrong, Ms. Berman offered an apology to placate Ms. Longmore because Ms. Berman did not want there to be tension with a coworker.

63.    Ms. Longmore responded in a harassing manor accusing Ms. Berman of "tagging in" Human Resources (HR).

64.    Ms. Longmore wrote that after the incident she "concluded that the situation did not warrant administrative attention," but she was angry with Ms. Berman for mentioning that Ms. Longmore had yelled at her on the phone.

65.    Ms. Berman had never contacted HR about the phone call.

66.    The only reason she mentioned the phone call with Ms. Longmore to her supervisor was to inform the supervisor that she needed extra time for lunch, not to get Ms. Longmore in trouble.

67.    Between July 18 and July 21, Ms. Berman continued to work and treat patients as usual; there was no indication that a report had been made regarding Ms. Berman to HR or that the Hospital was even aware of or was involved in the situation between Ms. Berman and Ms. Longmore.

68.    On July 22, Ms. Berman was contacted by her manager, Meeran Andrews, and was advised that a complaint was made to HR against her by Ms. Longmore and that HR wanted to interview Ms. Berman about the incident to hear her side of the story.

69.    A Zoom meeting was scheduled with the Hospital's HR department for July 25, 2022.

70.    Ms. Berman was not informed of the seriousness of the situation prior to the meeting, she was under the impression she was just being interviewed to get her side of the story.

71.    Ms. Berman was allowed to read a prepared statement explaining the story from her perspective.

72.    When she was done, the HR representative asked Ms. Berman, "did you not

see anything wrong with the fact that you made a statement that Muslims are inherently violent and would want to hurt you based solely on your ethnicity?"

73.    Ms. Berman did not make a statement to anyone ever saying that Muslims are inherently violent or that they would want to hurt her based solely on her ethnicity.

74.    She simply confided in a supervisor that she had personal concerns about how to treat an Orthodox Muslim patient as an identifiable Orthodox Jew, given the well-known tensions that existed at the time between two ethnic groups.

75.    The HR representative's question struck Ms. Berman as the proverbial, "when did you stop beating your wife" question.[9]

76.    Once Ms. Berman realized this interview was not to hear her side of story but just to accuse her of being Islamophobic and racist – which she is not - she asked if she could bring in a lawyer or representative.

77.    Ms. Berman felt attacked and scared that they would put words in her mouth, hence she asked to talk for counsel or a lawyer to make sure she wasn't saying anything that could be used against her.

78.    The HR representative abruptly told her that she is not allowed to have a lawyer or counsel present, or consult with one, because that is not how this "process works."

79.    Ms. Berman opted to remain silent for the rest of the meeting, which lasted only a few minutes.

---

[9] Laertius, Diogenes (1853). The Lives and Opinions of Eminent Philosophers. Translated by Yonge, Charles Duke. London: H.G. Bohn.

80.    No further investigation was conducted to verify Ms. Longmore's report.

81.    Dr. Goldwaser was not interviewed.

82.    Ms. Berman was told to return to work until further notice.

83.    On July 27, she received a termination letter.

84.    The letter was dated July 21, one day before Ms. Berman was even made aware of Ms. Longmore's complaint against her, and four days before her Zoom interview with HR.

85.    The letter contained verifiable falsehoods about the interactions between Ms. Berman, Ms. Longmore, and Ms. Goldwaser.

86.    The letter accused Ms. Berman of saying outrageous things to Dr. Goldwaser which Ms. Berman never said, and which could be easily verified as false by interviewing Dr. Goldwaser.

87.    The letter accused Ms. Berman of saying outrageous things to Ms. Longmore which Ms. Berman never said, and which could be easily verified as false by comparing Ms. Longmore's false version of events with the text exchanges between Ms. Berman and Ms. Longmore; in those exchanges the substance and tone of Ms. Longmore's texts are hostile whereas the substance and tone of Ms. Berman's texts are conciliatory.

88.    Among other outrageous lies, the letter accused Ms. Berman of suspecting that "the patient may have a weapon under her burka."

89.    Ms. Berman subsequently learned that after the phone call on July 18, Ms. Longmore had boasted to other employees about how she spoke to Ms. Berman on the phone, and that these witnesses could also corroborate Ms. Berman's version of events.

90.     Ms. Berman also learned that other coworkers heard Ms. Longmore say that if Ms. Berman had offended the wrong Muslims she could have had "guns drawn" on her, which ironically suggests that Ms. Longmore considers certain Muslims to be inherently violent.

91.     Ms. Berman also learned that other coworkers have heard Ms. Longmore say discriminatory remarks about Jewish people, but those employees did not report Ms. Longmore because they feared she would retaliate against them and try to get them fired, as she did to Ms. Berman.

92.     The letter stated that Ms. Longmore "called you around noon to speak with you regarding these comments," making no mention of the fact that Ms. Longmore had verbally assaulted Ms. Berman, which could easily be verified by the fact that Ms. Berman had called to extend her break because she was so distressed by the call, and by reviewing the text exchanges after the call between Ms. Meeran and Ms. Berman.

93.     Ms. Berman was aware that the Hospital has a Grievance Policy and Procedure.

94.     After receiving the termination letter, Ms. Berman sought to engage the Grievance Policy and Procedure.

95.     Since the Hospital didn't perform any investigation into Ms. Longmore's HR complaint, Ms. Berman attempted to follow the Grievance Policy to tell her version of events and possibly reverse the termination.

96.     The Grievance Policy and Procedures are set forth in the Hospital's Employee Handbook, which is only available in digital form and only accessible to employees via a password protected portal.

97.    When Ms. Berman went online to reference the Employee Handbook after she was terminated, she discovered that she did not have access to the password protected portal and was denied access to the Handbook and the Grievance Policy and Procedures.

98.    She contacted HR and requested access to the Handbook so she could follow the Grievance Process and so she could assess the general policies and procedures of the Hospital to prepare her case as to how she followed Hospital procedures and therefore her termination should be reversed.

99.    To her surprise, the Hospital only gave her what they deemed "relevant pages" of the Handbook.

100.    The pages that they provided only included the Grievance Policy.

101.    The rest of the Handbook, which was not provided to her, was relevant to her case because Ms. Berman intended to show that she followed the Hospital' policies on July 18 when she spoke to her supervisor.

102.    Ms. Berman subsequently learned on appeal that she was charged with violating Hospital policies found in the Handbook in Sections 5.1, 6.2, 8.0, and 600.02. The Hospital did not provide her with the pages of the Handbook which include those sections, and because she was locked out of the password protected portal, she had no way to access those sections.

103.    When she reviewed the minimal pages form the employee Handbook provided to her by the Hospital after her termination she immediately realized that the Hospital had changed the Grievance Policy since the last time she looked at it on July 22.

104.    Ms. Berman brought this to the attention of HR and asked that the policies

that existed on July 18, 2022, the date of the alleged incident, be applied to her case.

105.    HR denied this request and responded that the Hospital would apply the new policies and procedures to her case, even though those policies and procedures were put into place after she was terminated.

106.    Ms. Berman communicated with HR via email pursuant to the grievance process.

107.    She was told that she violated Hospital policies by privately confiding concerns with a supervisor, and the fact that the conversation was private is not a defense.

108.    If that is in fact the Hospital's policy, it contradicts the Medical Sonographer Code of Ethics, public policy, and common sense.  Employees, especial healthcare providers treating patients, must be permitted to speak openly about any concerns with supervisors without fear of being fired for being a racist. Any policy that makes healthcare providers hesitate before relaying concerns to supervisors endangers the patients.

109.    Throughout the Grievance Process, Ms. Berman followed the rules set forth in the Hospital's Handbook.

110.    The Hospital violated the rules of its own grievance process set forth in the Handbook by missing important deadlines.

111.    The main procedures set forth in the new grievance process are deadlines for submissions.

112.    On multiple occasions, during the process, the Hospital violated their own rules by failing to meet the proscribed deadlines.

113.    Ms. Longmore violated the Hospital's policies by calling and harassing Ms.

Berman but was never investigated or terminated for her actions.

114.    The Hospital obviously was determined to terminate Ms. Berman based on unsubstantiated allegations made by a coworker who had consistently broken the Hospitals policies.

115.    Ms. Berman is white Jewish female while Ms. Longmore is a black Muslim female. Upon information and belief, the Hospital made its decision to terminate Ms. Berman solely based on her religion and race.

116.    Rather than investigate whether Ms. Longmore's allegations against Ms. Berman were true, the Hospital considered the religion of the employees to be the only determining factor.

117.    If the Hospital had done an actual investigation into the incident without racial or religious bias Ms. Berman would not have been the one terminated.

118.    Even if the Hospital decided that Ms. Berman had made an offensive comment in private to her supervisor, if race and religion were not factors she would certainly not have been terminated for such a minor offense, especially given her impeccable employment record.

119.    Further, if race and religion were not factors in the decision to terminate Berman, the decision to terminate her would not have been made on July 21, before Ms. Berman had been told about the complaint and before an interview with HR was even scheduled.

120.    Following her wrongful termination Ms. Berman has suffered substantial mental anguish, loss of a great professional reputation, and her ability for professional

growth.

121.    Due to her termination being based in the false accusation of her being a racist or Islamophobic, Ms. Berman was forced to accept employment at an organization that is owned by Orthodox Jews who would look past these false accusations.

122.    Ms. Berman's new employment does not only not offer room for professional growth or promotion it also is significantly far away from her home in a different state.

123.    The Hospital offered Ms. Berman the ability to grow professionally, significant promotions, and a short commute.

124.    Ms. Berman being terminated under the false guise of Islamophobia and racism, also had a significant effect on her self-esteem and her ability to gain employment at another hospital.

125.    Ms. Berman is not and never has been racist or Islamophobic, and to have on her employment record that she was terminated due to being racist or Islamophobic has taken a negative toll on her.

## <u>Prior Incidents of the Hospital's Discrimination<br>based on Plaintiff's Orthodox Jewish beliefs</u>

**Physical Assault**

126.    On or about November 19, 2018, while being employed at the Hospital, Ms. Berman was physically assaulted by a superior at the Hospital.

127.    Ms. Berman had just given birth in March of 2018 to one of her children, and when she came to work on November 19, 2018, a superior came over to her and grabbed her post-partum stomach area saying, "Hey what's going on there?"

128.    She felt violated and assaulted by this action and was in disbelief that a superior thought that behavior was appropriate.

129.    She then filed a report with HR on February 14, 2019, specifically naming the superior that had assaulted her. It should still be in her employment file.

130.    After the report was filed with HR, no investigation was done and no persons were terminated for this physical assault.

131.    Ms. Berman was never contacted after the initial report was made to give any further details of the assault or surrounding issues.

132.    The Hospital terminated Ms. Berman for a complaint about an alleged comment she made in private, but her superior was permitted by the Hospital to assault Ms. Berman without any consequence or even an investigation.

133.    It is against the Hospital's policies to physically assault or touch someone without their permission.

**Inappropriate Harassment based on religion**

134.    Throughout Ms. Berman's employment at the Hospital, she was harassed about her religious beliefs and practices.

135.    While most of her coworkers treated her with respect, there were others who were permitted to routinely ask Ms. Berman inappropriate, sexual, or unprofessional questions about her religion.

136.    For example, she was asked on multiple occasions about how her religious beliefs impact the intimate relationship between her and her husband.  These are topics that Ms. Berman would never discuss. Ms. Berman did not do anything to elicit these illicit and

inappropriate questions. She would always ignore the questions, but they made her extremely uncomfortable.

137.    Unlike Ms. Longmore, she never reported these harassing questions and comments because she did not want a hostile work environment and hoped that they would eventually stop since she never answered them with anything besides a curt response.

138.    This constant harassment about her sexual preferences made her very uncomfortable, and her work environment hostile.

139.    This constant harassment of her sexual preferences went on for much of her employment at the Hospital with nothing ever being done about.

140.    Some of Ms. Berman's supervisors were aware of it and even participated.

141.    These offensive and discriminatory comments and questions were made in the open during work hours, sometimes in earshot of patients.

**Inappropriate COVID Harassment based on religion**

142.    After the COVID 19 Vaccine was released, it was widely reported that many Jewish persons in New York refused to take the vaccine.

143.    During that time, Ms. Berman was repeatedly asked about why "her people," referring to the Jewish people, were refusing the vaccine.

144.    Her coworkers harassed her about this in the open at the Hospital, in the hallways, around patients, and around other coworkers.

**COBRA Violations**

145.    Ms. Berman was terminated on July 27, 2022.

146.    On August 8, 2022, she contacted the hospital to gain the information she

needed to file for COBRA benefits.

147.    Ms. Berman got a reply from the Hospital on August 8, 2022, stating that the Hospital would send her the COBRA paperwork.

148.    The paperwork was never sent to Ms. Berman.

149.    Meanwhile, the Hospital never dropped her from the health insurance plan.

150.    Ms. Berman reasonably assumed that the Hospital did not terminate her health care plan either because her appeal was still be considered, or because the Hospital was obligated to keep her on the plan so long as they did not comply with COBRA.

151.    On October 26, 2022, Ms. Berman got a notification that her health insurance plan has been canceled and that since it was over 2 months since her termination, she could no longer gain COBRA benefits.

152.    After Ms. Berman got the notification that her health insurance plan had been canceled, she received several bills for all health care she received since her termination on July 27, 2022.

153.    Ms. Berman immediately contacted the Hospital regarding her health insurance and COBRA benefits on October 26, 2022.

154.    Ms. Berman again contacted the Hospital on October 27, 2024 because she did not receive a response on October 26, 2024.

155.    Ms. Berman was told that the Hospital had never filed her termination paperwork with her insurance provider until October 28, 2022.

156.    When the Hospital finally filed her termination paperwork, the Hospital then backdated the insurance paperwork to Ms. Berman's termination date of July 27, 2022.

157.    Ms. Berman was then left to pay for all of the health care that she received from July 27, 2022, to October 28, 2022.

158.    Ms. Berman's insurance plan was also the insurance that covered her husband, her four children, and her pregnancy.

159.    Under COBRA, an employer must notify the group health plan administrator of an individual's COBRA eligibility within 30 days of termination, provide notification about COBRA privileges to an employee that qualifies within 44 days, notify beneficiaries within 14 days if COBRA is denied, and provide coverage identical to the plan the employee was enrolled in before termination if the employee elects to continue coverage under COBRA.

160.    Accordingly, the Hospital had until August 26, 2022, to notify Ms. Berman's insurance provider of Ms. Bermans eligibility for COBRA.

161.    The Hospital violated COBRA by failing to notify her until October 27, 2022, 92 days after Ms. Bermans termination.

162.    The Hospital had until September 9, 2022, to notify Ms. Berman of her COBRA rights, yet Ms. Berman was only informed her insurance was canceled on October 26, 2022, and still not informed of her COBRA rights.

163.    The Hospital failed to provide an identical insurance coverage plan under COBRA to Ms. Berman because they had failed to file Ms. Berman's termination with her insurance provider and failed to inform Ms. Berman of her COBRA privileges until after she was no longer eligible to receive COBRA.

164.    As a hospital, it is indefensible to deprive someone of their COBRA benefits

by filing paperwork required by federal law 92 days late, and then backdating the paperwork to the detriment of the terminated employee.

165.    After Ms. Berman spent excessive time making countless phone calls and emails, she was able to retroactively gain her COBRA benefits, without any help from the Hospital.

166.    Since Ms. Berman was pregnant and a mother of four children when she was terminated, she had countless medical bills that she needed to organize and file to gain her retroactive COBRA benefits.

167.    As of November 13, 2023, Ms. Berman is still attempting to get her COBRA benefits applied to medical bills she incurred after being terminated.

168.    Retroactively applying for and gaining COBRA benefits is no small or easy task, Ms. Berman has been put under unnecessary stress with having to retroactively apply.

169.    Retroactively applying for COBRA benefits would be extremely difficult and stressful on a single person, Ms. Berman is not a single person, she is a married mother of 5, with one of those 5 being a newborn.

170.    There is no reason Ms. Berman should have been put under this ongoing unnecessary stress to gain COBRA benefits that should have been offered to her right after her termination.

171.    These COBRA violations are not only a flagrant violation of federal law, but they are also further retaliation against Ms. Berman for engaging in the grievance process and challenging her termination.

## COUNT I

**Title VII of the Civil Rights Act of 1964**
**42 U.S.C. §§ 2000e - 2000e17**
**Discrimination Based on Race**

172.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

173.    Defendants have deprived the Plaintiff her right under the Civil Rights Act of 1964 to be employed without discrimination based on her race.

## COUNT II

**Title VII of the Civil Rights Act of 1964**
**42 U.S.C. §§ 2000e - 2000e17**
**Discrimination Based on Religion**

174.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

175.    Defendants have deprived the Plaintiff her right under the Civil Rights Act of 1964 to be employed without discrimination based on her religion.

## COUNT III

**Title VII of the Civil Rights Act of 1964**
**42 U.S.C. §§ 2000e - 2000e17**
**Retaliation**

176.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

177.    Defendants have deprived the Plaintiff her right under the Civil Rights Act of 1964 to be employed without discrimination based on retaliation.

## COUNT IV

### Title VII of the Civil Rights Act of 1964
### 42 U.S.C. §§ 2000e - 2000e17
### Wrongful Termination

178.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

179.    Defendants have deprived the Plaintiff her right under the Civil Rights Act of 1964 to be employed without discrimination.

## COUNT V

### 29 U.S.C. Code Part 6
### Violation of COBRA Benefits

180.    The foregoing paragraphs are incorporated by reference as if set forth fully herein.

181.    Defendants have deprived the Plaintiff her right under 29 U.S.C. Code Part 6 to her COBRA benefits.

## PRAYER FOR RELIEF

A.    An order declaring Defendant's conduct to be unlawful and violations under the Civil Rights Act of 1964;

B.    An order enjoining Defendants from continuing to engage in conduct found to be a violation under the Civil Rights Act of 1964;

C.    An order awarding Plaintiff's damages suffered as a consequence of Defendants' violation of Plaintiff's rights.

D.    An order awarding Plaintiff's damages for the violation of Plaintiff's rights;

E.    Any other relief, including attorneys' fees, the Court judges to be proper, and/or is permitted under FRCP 54(c), 42 U.S.C 1988, and. Tex. Gov't Code § 551.142.

## DEMAND FOR JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury in this action on all issues so triable.

Dated:                                          Respectfully submitted,

                                                By: _____
                                                Jonathan Gross Esq.
                                                NJ Bar ID:388002022
                                                2833 Smith Ave., Suite 331
                                                Baltimore, MD 21209
                                                (443) 813-0141
                                                Jonathansgross@gmail.com

                                                *Attorney for the Plaintiff*